JOHN NILE UPDEGRAFF,      :
                          :
        Plaintiff         :    No. 3:12-CV-00197
                          :
    vs.                   :    (Judge Nealon)
                          :
CAROLYN W. COLVIN, ACTING :          **FILED**
COMMISSIONER OF SOCIAL    :          **SCRANTON**
SECURITY,                 :
                          :          JUN 2 1 2013
        Defendant         :

                    **MEMORANDUM**         PER ――――――――――
                                              DEPUTY CLERK

## Background

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff John Nile Updegraff's claim for social security disability insurance benefits and supplemental security income benefits.

Updegraff protectively filed[1] applications for disability insurance benefits and supplemental security income benefits on February 17, 2006. Tr. 11, 34, 43-48 and 158-160.[2]  On July 20, 2006, the Bureau of Disability Determination[3] denied

---

1.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

2.  References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of the Answer on April 2, 2012.

3.  The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability
(continued...)

Updegraff's applications. Tr. 36-39 and 163-167. On August 14, 2006, Updegraff requested a hearing before an administrative law judge. Tr. 40. After a delay of approximately 18 months, a hearing was held before an administrative law judge on February 21, 2008. Tr. 171-190. At the administrative hearing Updegraff and a vocational expert testified. Id. Updegraff was represented by counsel at the hearing. Id. On March 10, 2008, the administrative law judge issued a decision denying Updegraff's applications. Tr. 11-19. On March 14, 2008, Updegraff requested that the Appeals Council review the administrative law judge's decision. Tr. 263. After about 10 months had passed, the Appeals Council on January 8, 2009, concluded that there was no basis upon which to grant Updegraff's request for review. Tr. 4-7. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Updegraff, acting pro se, then filed on March 6, 2009, a complaint in this court requesting that we reverse the decision of the Commissioner denying him disability and supplemental security income benefits. Updegraff v. Astrue, Civil No. 09-00424 (M.D. Pa)(Muir, J.). On September 2, 2009, that case was remanded by Judge Muir to the Commissioner for further proceedings. Judge Muir's opinion in relevant part explained the basis for the remand as follows:

---

3. (...continued)
insurance benefits and supplemental security income benefits on behalf of the Social Security Administration. Tr. 36 and 163.

The administrative record in this case is 190 pages in length and the brief submitted by the Commissioner accurately describes the medical and vocational evidence contained within that record. Doc. 11, Brief of Defendant, pages 4-10. The administrative law judge's decision also with the exception discussed below thoroughly and accurately describes the medical and vocational evidence. We will not review in this order the medical and vocational evidence but focus on the legal and factual errors committed by the administrative law judge which require us to remand the case for further proceedings. We are unable to conclude that those errors are harmless.

During and prior to the administrative hearing held on February 21, 2008, the administrative law judge was made aware of the fact that Updegraff was being treated by Karen L. Thomas, M.D., and Lisa Galloway, M.D. Tr. 147, 174 and 183. However, the administrative law judge did not obtain Updegraff's medical records from those two physicians. By failing to obtain those records the administrative law judge failed to develop adequately the record as he was required to do. . . .

This error is compounded by a misstatement of fact set forth in the administrative law judge's decision. At page 6 of the decision, the administrative law judge states as follows:

> Also included in the claimant's medical evidence is an employability assessment form from a Dr. Karen Thomas. That form which is dated July 19, 2006, indicated that the claimant suffers from cervical disc disease, however, **makes no ultimate finding with regard to the claimant's disability** and provides little guidance to the undersigned with regard to Dr. Thomas's ultimate findings.

Tr. 16 (emphasis added). A review of that disability form reveals that Dr. Thomas concluded that Updegraff as of July 19, 2006, was permanently disabled. Dr. Thomas checked a box on the form which was followed by the statement: "PERMANENTLY DISABLED - Based on my assessment, I find that the patient now has a physical or mental condition which permanently precludes any gainful employment. The patient is a candidate for Social Security Disability or SSI." Tr. 136. The administrative law judge erred by concluding that Dr. Thomas had no opinion regarding whether Updegraff was

3

> disabled. He further erred by failing to obtain the
> records of Dr. Thomas's treatment of Updegraff in order
> to review those records and to determine whether those
> records were consistent with Dr. Thomas's opinion. The
> administrative law judge as stated above also failed to
> obtain Updegraff's medical records from Dr. Galloway.

Updegraff v. Astrue, Civil No. 09-00424, slip op. at 6-8 (M.D.Pa.
September 2, 2009)(Muir, J.). Tr. 196-204.

A second hearing before a different administrative law
judge was held on December 2, 2009. Tr. 208 and 492-518. At the
administrative hearing, Updegraff and a vocational expert
testified. Id. Updegraff was represented by counsel at the
hearing. Id. On January 20, 2010, the administrative law judge
issued a decision denying Updegraff's application. Tr. 208-221.
Prior to rendering a decision, the administrative obtained and
reviewed records from Dr. Thomas and Dr. Galloway. Id. On
February 11, 2010, Updegraff requested that the Appeals Council
review the administrative law judge's decision. Tr. 194-195.
After about 2 years had passed, the Appeals Council on January 12,
2012, concluded that there was no basis upon which to grant
Updegraff's request for review. Tr. 191-193. Thus, the
administrative law judge's decision stood as the final decision of
the Commissioner.

Updegraff then filed a pro se complaint in this court on
February 1, 2012. Supporting and opposing briefs were submitted

and the appeal[4] became ripe for disposition on June 11, 2012, when Updegraff filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Updegraff met the insured status requirements of the Social Security Act through December 31, 2006. Tr. 11, 52, 56, 208 and 210. In order to establish entitlement to disability insurance benefits Updegraff was required to establish that he suffered from a disability on or before that date. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. § 404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Supplemental security income (SSI) is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income. Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Updegraff was born in the United States on December 23, 1962, and at all times relevant to this matter was considered a

_____

4. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

"younger individual"[5] whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.963(c). Tr. 34, 43-44, 53, 158 and 174.

Updegraff graduated from high school in June, 1981, and can read, write, speak and understand the English language. Tr. 63, 68 and 175. During his elementary and secondary schooling, Updegraff attended regular education classes. Tr. 68. After high school, Updegraff did not complete "any type of special job training, trade or vocational school." Id. From May, 1983 to April, 1988, Updegraff served in the United States Navy. Tr. 74 and 175.

Updegraff has past relevant employment[6] as a laborer which involved material handling (furnaces, stoves, boilers, etc.) and was described by a vocational expert as unskilled, heavy work; as a parking lot attendant described as semi-skilled, light work; as a residential advisor described as semi-skilled, light work and

---

5. At the time of the second administrative hearing and the ALJ's decision, Updegraff was 46 and 47 years of age, respectively. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

6. Past relevant employment in the present case means work performed by Updegraff during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

as a maintenance person described as semi-skilled, light to medium

work.[7] Tr. 512-514.

---

7. The terms sedentary, light, medium and heavy work are defined
in the regulations of the Social Security Administration as
follows:

> (a) *Sedentary work.* Sedentary work involves lifting no
> more than 10 pounds at a time and occasionally lifting
> or carrying articles like docket files, ledgers, and
> small tools. Although a sedentary job is defined as
> one which involves sitting, a certain amount of walking
> and standing is often necessary in carrying out job
> duties. Jobs are sedentary if walking and standing are
> required occasionally and other sedentary criteria are
> met.

> (b) *Light work.* Light work involves lifting no more
> than 20 pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds. Even
> though the weight lifted may be very little, a job is
> in this category when it requires a good deal of
> walking or standing, or when it involves sitting most
> of the time with some pushing and pulling of arm or leg
> controls. To be considered capable of performing a
> full or wide range of light work, you must have the
> ability to do substantially all of these activities.
> If someone can do light work, we determine that he or
> she can also do sedentary work, unless there are
> additional limiting factors such as loss of fine
> dexterity or inability to sit for long periods of time.

> (c) *Medium work.* Medium work involves lifting no more
> than 50 pounds at a time with frequent lifting or
> carrying of objects weighing up to 25 pounds. If
> someone can do medium work, we determine that he or she
> can do sedentary and light work.

> (d) *Heavy work.* Heavy work involves lifting no more
> than 100 pounds at a time with frequent lifting or
> carrying of objects weighing up to 50 pounds. If
> someone can do heavy work, we determine that he or she
> can also do medium, light, and sedentary work.

20 C.F.R. § 404.1567.

Updegraff reported that he had worked as a laborer in the heating, ventilation and air conditioning field from June, 1988, to April, 1995; as a parking lot attendant from November, 1995, to September, 1998; as a residential advisor from October, 2000, to August, 2001; and as a maintenance person for a hotel from April, 2002, to February, 2003. Tr. 74.

The records of the Social Security Administration reveal that Updegraff had earnings in the years 1978, 1981 through 1998 and 2000 through 2003. Tr. 57. Updegraff's annual earnings range from a low of $126.54 in 1978 to a high of $18,1333.50 in 2001. Id. Updegraff's total earnings during those 23 years were $157,056.68. Id.

Updegraff claims that he became disabled on February 1, 2003, because of neck pain (cervical disc disease), a back sprain, hypertension, carpal tunnel syndrome, chronic fatigue, headaches, and depression. Tr. 43-44, 63-64, 85-86, 94 and 181. At the time of the onset of his alleged disability, Updegraff was working as a maintenance person for the Genetti Hotel, Williamsport, Pennsylvania. Tr. 93. Updegraff allegedly suffered a work-related injury to his neck and back in November, 1995, while operating a jack hammer. Tr. 130, 145, 168, 273, 498 and 524-527. In 1996, Updegraff underwent fusion surgery at the C5-C6 and C6-C7 levels of the cervical spine because of that work-related injury. However, as noted above Updegraff continued to work for several years after that surgery. Tr. 66, 145, 268, 273-275, 498 and 528-

529.  Updegraff, then while working at the Genetti Hotel,
purportedly reinjured his neck and back.

        For the reasons set forth below, the Court will affirm
the decision of the Commissioner denying Updegraff's applications
for disability insurance benefits and supplemental security income
benefits.

**Standard Of Review**

        When considering a social security appeal, the Court has
plenary review of all legal issues decided by the Commissioner.
See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d
Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181
F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d
857, 858 (3d Cir. 1995).  However, the Court's review of the
Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is
to determine whether those findings are supported by "substantial
evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir.
1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).
Factual findings which are supported by substantial evidence must
be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34,
38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported
by substantial evidence, we are bound by those findings, even if
we would have decided the factual inquiry differently."); Cotter
v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by
the Secretary must be accepted as conclusive by a reviewing court
if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d

1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. <u>Brown</u>, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason</u>, 994

F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## Sequential Evaluation Process

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

11

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[8] (2) has an impairment that is severe or a combination of impairments that is severe,[9] (3) has an

---

8. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 404.1510 and 20 C.F.R. § 416.910.

9. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b). An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

12

impairment or combination of impairments that meets or equals the requirements of a listed impairment,[10] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[11]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20

---

10. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

11. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1
("'Residual functional capacity' is defined as that which an
individual is still able to do despite the limitations caused by
his or her impairment(s).").

## Medical Records

Before the Court addresses the administrative law
judge's decision and the arguments of Updegraff and the
Commissioner, some of Updegraff's medical records will be
reviewed.

Updegraff has been treated by several physicians. From
January 24, 2003, through June 29, 2006, Updegraff had at least 20
appointments with Aaron J. Kolb, M.D., of Susquehanna Health
System, The WorkCenter. Tr. 112-130 and 413-421. Dr. Kolb
consistently reported limited range of motion of Updegraff's
cervical spine but never indicated that Updegraff was totally
disabled. Id. Instead, these treatment notes merely indicate that
Updegraff could not lift or push or pull above a specified
poundage. Id. The amounts mentioned in the treatment notes
generally ranged from 20 to 35 pounds. Id. Although there was one
occasion where Updegraff was limited to lifting no more than 10
pounds, that restriction only lasted from May 22, 2003 to June 5,
2003. Tr. 124-125. The treatment notes also reveal that Dr. Kolb
was of the opinion that Updegraff should not engage in repetitive

movements of his neck or waist, including repetitive or continuous upward gazing. Id.

At an appointment on August 3, 2004, Dr. Kolb described Updegraff's work status as follows: "No lifting over 25 pounds. No pushing or pulling over 25 pounds. Avoid repetitive or continuous upward gaze." Tr. 119. At an appointment on January 24, 2005, Dr. Kolb's description was the same except he noted: "No repetitive bending or twisting of the back or neck." Tr. 116. On March 4 and July 29, 2005, Dr. Kolb stated that Updegraff's work restriction remained the same. Tr. 114-115. At an appointment on October 3, 2005, Dr. Kolb's description was the same except he stated that Updegraff should engage in "[m]inimal twisting of the neck." Tr. 113. At appointments on November 28, 2005 and April 7 and June 29, 2006, Dr. Kolb continued the same restrictions. Tr. 112, 413 and 417. The June 29th appointment appears to be the last medical appointment that Updegraff had with Dr. Kolb.

Dr. Kolb's notes of an appointment on September 1, 2004, clearly reveal Dr. Kolb's opinion as to whether or not Updegraff was totally disabled. Tr. 118. At that appointment, Updegraff complained of back pain in the lower left side. Id. Dr. Kolb reports that he did not have a chance to examine Kolb at the appointment and describes the encounter with Updegraff as follows:

> He describes spasms and sharp shooting pain. He
> describes an episode two weeks ago when he lost strength
> in his legs and fell. He continues to complain[] of

15

urinary difficulty that he reported on the visit of
8/3/04. He claims to have stopped all medication but
the Ambien for about two weeks and it hasn't helped.
The patient again handed me a medical assistance form
and wanted me to sign that he was permanently disabled
from any gainful employment. Approximately two weeks ago
he had mailed similar forms to me, and in fact two
copies of them and had written all over them. **It was
basically a demand that I would sign the same thing
on those forms. I in fact told him that I could not
sign them. I reiterated that today that I could not
sign that he was permanently disabled from any gainful
employment.** At that point the patient got up and left
the exam room and walked out into the waiting room and
then returned for a copy of his forms.

Tr. 118 (emphasis added).

Updegraff had similar encounters with another treating

physician, Jonathan Gessner, M.D. Tr. 478-483. At an appointment

with Dr. Gessner on October 19, 2004, Updegraff requested that Dr.

Gessner complete "disability papers" but also reported that he was

walking "a mile a day." Tr. 482. In the report of that

appointment Dr. Gessner stated as follows: "Patient's disability

papers were not signed. He was instructed to contact the Work

Center, who has been following him, to get the papers signed." Tr.

483. On November 23, 2004, Updegraff again presented disability

paperwork to Dr. Gessner who refused to complete or sign the

documents. Tr. 478-479. Dr. Gessner noted the following: "Dr.

Kolb did not sign papers stating that Mr. Updegraff was

permanently disabled. Likewise, I did not sign these papers since

I am presently only following him for [high blood pressure], and

this is not any reason to render him unemployable. I once again

16

referred him to the work center." Tr. 479. At an appointment with Dr. Gessner on August 7, 2006, Updegraff complained of "an earache is his [right] ear[.]" Tr. 464. Dr. Gessner noted that Updegraff reported that he had been swimming. Id. Dr. Gessner's assessment was that Updegraff was suffering from an external ear infection and prescribed ear drops. Tr. 465.

On November 23, 2005, Gerald Gryczko, M.D., reviewed Updegraff's medical records on behalf of the Bureau of Disability Determination and concluded that Updegraff had the ability to engage in a limited range of light work. Tr. 102-109. Dr. Gryczko found that Updegraff could lift and/or carry 20 pounds occasionally and 10 pounds frequently; could stand and/or walk about 6 hours in an 8-hour workday; could sit about 6 hours in an 8-hour workday; had limited pushing/pulling ability in the upper extremities; could frequently climb ramps and stairs, balance, stoop, kneel, crouch but never climb ladders, ropes or scaffolds or crawl. Id. Furthermore, Dr. Gryczko found that Updegraff had no manipulative, visual, communicative or environmental limitations. Id.

On May 17, 2006, Marcus Riedhammer, M.D., performed a one-time examination of Updegraff and completed a medical source statement of Updegraff's abilities to perform work-related physical abilities. Tr. 132-135. Updegraff told Dr. Riedhammer that he was able to carry out his activities of daily living

17

without any pain and that "he does not cook or clean, because he does not 'have the motivation.'" Tr. 132. Updegraff further stated he could carry 2 gallons of milk without pain. Id. After conducting a physical examination, Dr. Riedhammer concluded that Updegraff could engage in work that involved lifting and/or carrying of 10 pounds on a frequent basis and 20 pounds on an occasional basis; involved standing and walking up to 2 hours during an 8-hour workday; and involved sitting up to 8 hours during an 8-hour workday. Tr. 134-135. Furthermore, Dr. Riedhammer stated that Updegraff had no limitations in pushing or pulling; could occasionally engage in bending, kneeling, stooping, crouching, balancing but never climbing; and Updegraff had no manipulative or environmental limitations. Id.

Updegraff had appointments with Karen Peterman, a certified nurse practitioner, on March 20, May 5, and October 16, 2006, and January 23, October 8, and November 19, 2007, primarily regarding his high blood pressure. Tr. 280-286, 290-296 and 300-305. Nurse Peterman's treatment notes do not reveal any objective work-related functional limitations. Id. The physical examination findings were always essentially normal other than Updegraff's blood pressure was at times elevated. Id.

As stated earlier in this memorandum the case was remanded for further proceedings because the record was not developed with regard to the treatment notes of Dr. Thomas. On

18

remand, the administrative law judge received all the treatment notes of Dr. Thomas, as well as Dr. Galloway, that were available.

On July 19, 2006, Updegraff had an appointment with Dr. Thomas. Tr. 287-289. Dr. Thomas reported no adverse objective physical examination findings. Tr. 288. Updegraff's blood pressure was 120/82. Tr. 287. Dr. Thomas's diagnosis was that Updegraff suffered from high blood pressure and neck pain. Tr. 288. Although this is the only appointment that Updegraff had with Dr. Thomas, a form was completed by Dr. Thomas on the same day indicating in a conclusory fashion without specifying any work-related functional abilities such as the ability to sit, stand, walk, and lift and carry objects, that Updegraff was permanently disabled from engaging in any gainful employment. Tr. 136. The report of this appointment also indicates that Updegraff had a normal electromyography of the upper extremities. Tr. 282 and 287.

On December 7, 2006, Donald W. Hess, M.D., took over treatment of Updegraff from Dr. Kolb. Tr. 408. From that date until September 27, 2007, Updegraff had 7 appointments with Dr. Hess. Tr. 385-388, 390-397, and 400-412. Dr. Hess continued the work restrictions imposed by Dr. Kolb. Id. Although Dr. Hess considered those work restrictions permanent, he never indicated that Updegraff was totally disabled from any gainful employment. Id. On September 27, 2007, Dr. Hess described in relevant part

Updegraff's work status as follows: "No change in his work restrictions. Not to be lifting more than 25 pounds, no pulling more than 25 pounds, minimal twisting of the neck, minimal twisting at the waist." Tr. 385.

On June 6, 2007, Updegraff had an appointment with nurse Peterman regarding his high blood pressure. Tr. 297-299. Updegraff reported that he felt "pretty good." Tr. 297. Nurse Peterman's treatment notes do not reveal any objective work-related functional limitations. Id. The physical examination findings were always essentially normal other than Updegraff's blood pressure was elevated at 145/95. Id.

On January 15, 2008, Updegraff had his first appointment with Dr. Galloway. Tr. 377-381. Dr. Galloway at this appointment did not conduct a physical examination other than recording Updegraff's vital signs: blood pressure, pulse and respiration. Tr. 378 and 381. After conducting a clinical interview and recording Updegraff's subjective complaints, Dr. Galloway referred Updegraff to a physical therapist for a functional capacity evaluation. Tr. 378. In the interim, Updegraff's work limitations remained the same as those imposed by Dr. Hess. Id.

The functional capacity evaluation was performed on January 30 and 31, 2008, by physical therapist Melinda Sechrist at Divine Providence Hospital in Williamsport, Pennsylvania. Tr. 147-155. After conducting an elaborated physical functional

20

evaluation, including strength and range of motion testing, Ms. Sechrist concluded that Updegraff could engage in light to medium work as defined by the U.S. Department of Labor.[12] Tr. 148.

On February 8, 2008, Updegraff had an appointment with Dr. Galloway at which he complained of neck, low back and right leg pain. Tr. 373-374. Dr. Galloway noted that she "discussed with the patient that I felt like the [functional capacity evaluation] report gave a good indication [of] what he was physically capable of doing." Tr. 373. Updegraff's blood pressure at this appointment was 122/82 and his pulse was 58. Tr. 376. Although no formal physical examination was performed Updegraff was "awake, alert and in no acute distress" and he was slightly guarded while sitting. Tr. 374. Dr. Galloway indicated that Updegraff's work status was "disabled." Tr. 374. However, Dr. Galloway in treatment notes of an appointment on March 14, 2008, clarified this work status by stating as follows: "permanently disabled from previous job." Tr. 368 (emphasis added). The physical examination findings on March 14 were as follows: "The patient is awake, alert, and in no acute distress. [His blood pressure was 124/82, pulse 80 and respiration 20]. Back: Upon inspection there is no soft tissue swelling or discoloration

--------

12. The definitions of the physical exertional levels of work (i.e., sedentary, light, medium, etc.) set by the Department of Labor are the same as the definitions for the exertional levels contained in the Social Security regulations.

noted. The patient has some mild diffuse tenderness in the left paravertebral muscles of the lower lumbar spine. There is no point spinal tenderness. Range of motion. The patient does flex to about 70-80 degrees [80-105 being normal]. Gait: Normal. Psychiatric: Affect is normal." Tr. 367. The physical examination findings at an appointment with Dr. Galloway on May 9, 2008, were unchanged. Tr. 362.

On May 6 and August 6, 2008, Updegraff had appointments with nurse Peterman regarding his high blood pressure. Tr. 314-316 and 320-322. On May 6th Updegraff's blood pressure was 139/81 and on August 6th it was 124/82. Id. Nurse Peterman's treatment notes do not reveal any objective work-related functional limitations. Id. The physical examination findings were always essentially normal other than Updegraff's blood pressure was slightly elevated on May 6th. Id.

On September 19, 2008, Updegraff had an appointment with nurse Peterman to have a medical assistance form completed. Tr. 278 and 323. Although nurse Peterman at this appointment did not record any objective physical examination finding other than Updegraff was alert and cooperative, she completed the form by checking a box which stated in a conclusory fashion that Updegraff was permanently disabled from any gainful employment. Id.

22

**Discussion**

The administrative law judge, at step one of the sequential evaluation process, found that Updegraff had not engaged in substantial gainful work activity since February 1, 2003, the alleged disability onset date. Tr. 210.

At step two of the sequential evaluation process, the administrative law judge found that Updegraff had the following severe impairments: "degenerative joint disease and depression[.]" Id. The ALJ found that Updegraff's high blood pressure was a non-severe impairment because there was no indication that Updegraff had any limitations in his ability to perform work activities as a result of that condition. Tr. 211. With respect to Updegraff's alleged carpal tunnel syndrome, the administrative law judge found that it was a non-medically determinable impairment because an EMG of Updegraff's upper extremities was normal and physical examinations of the upper extremities were normal. Tr. 210-2111.

At step three of the sequential evaluation process, the administrative law judge found that Updegraff's impairments did not individually or in combination meet or equal a listed impairment. Tr. 211-213.

At step four of the sequential evaluation process, the administrative law judge found that Updegraff could not perform his past relevant work but that he had the residual functional capacity to perform a limited range of unskilled, light work. Tr.

23

213. The administrative law judge found that Updegraff could perform light work within the limitations set by Dr. Kolb and Dr. Hess. Updegraff was limited to occasionally lifting/carrying 25 pounds; Updegraff had no limitations with regard to sitting; he could stand/walk up to 6 hours in an 8-hour workday; he was limited to pushing and/or pulling no more than 25 pounds; he could not engage in any overhead work, and only occasional twisting of the neck; and the work had to involve only simple and repetitive tasks. Id. The administrative law judge also relied on the opinion of Dr. Gryczko and the functional capacity evaluation performed by Ms. Sechrist in setting the residual functional capacity.

In setting the residual functional capacity, the administrative law judge also found that Updegraff's medically determinable impairments could reasonably be expected to cause his alleged symptoms but that his statements concerning the intensity, persistence and limiting effects of those symptoms were not credible to the extent they were inconsistent with the ability to perform a limited range of light work. Tr. 214. The administrative law judge rejected the conclusory opinion of Dr. Thomas because she only examined Updegraff on one occasion and her treatment notes did not suggest that Updegraff was totally disabled. Tr. 216.

24

Based on the above residual functional capacity and the testimony of a vocational expert the administrative law judge at step five of the sequential evaluation process found that Updegraff could perform unskilled, light work as an inspector, guard/doorkeeper and ticket taker and that there were a significant number of such jobs in the state and national economies. Tr. 220 and 515. The vocational expert also testified that these positions would be appropriate even if the standing and walking requirements were reduced from 6 hours to the maximum of 2 hours set by Dr. Riedhammer in his functional capacity assessment of May 17, 2006. Tr. 134-135 and 515-516.

Updegraff, who is proceeding pro se, basically claims that the administrative law judge's decision is not supported by substantial evidence and that the ALJ failed to appropriately evaluate the opinions of his treating medical providers. The administrative record in this case is 540 pages in length, primarily consisting of medical and vocational records. The Court has thoroughly reviewed the record in this case and finds no merit in Updegraff's arguments. The administrative law judge did an excellent job of reviewing Updegraff's vocational history and medical records in his decision. Tr. 208-221. Furthermore, the brief submitted by the Commissioner adequately reviews the medical and vocational evidence in this case. Doc. 12, Brief of Defendant.

Initially the Court notes that no treating or examining physician has indicated that Updegraff suffered from physical functional limitations that would preclude him from engaging in the limited range of light work set by the administrative law judge in his decision for the requisite statutory 12 month period.[13]  Furthermore, the Court cannot conclude from the bare medical records that Updegraff is totally disabled.  The administrative law judge identified unskilled, light work which Updegraff could perform.  No physician indicated that Updegraff was incapable of working at that modest level on a full-time basis.

The administrative law judge rejected the conclusory opinion of Dr. Thomas.  The Court of Appeals for this circuit has set forth the standard for evaluating the opinion of a treating physician in Morales v. Apfel, 225 F.3d 310 (3d Cir. 2000).  The Court of Appeals stated in relevant part as follows:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." . . . The ALJ

13.  As stated earlier in this memorandum to receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

> must consider the medical findings that support a
> treating physician's opinion that the claimant is
> disabled. In choosing to reject the treating
> physician's assessment, an ALJ may not make
> "speculative inferences from medical reports" and
> may reject "a treating physician's opinion outright
> only on the basis of contradictory medical evidence"
> and not due to his or her own credibility judgments,
> speculation or lay opinion.

Id. at 317-18 (internal citations omitted). The administrative law

judge is required to evaluate every medical opinion received. 20

C.F.R. § 404.1527(d). In the present case, the administrative law

judge in his decision specifically addressed the opinion of Dr.

Thomas as well as the credibility of Updegraff. Tr. 59.

The social security regulations specify that the opinion

of a treating physician may be accorded controlling weight only

when it is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with

other substantial evidence in the case. 20 C.F.R. §

404.1527(d)(2); SSR 96-2p. Likewise, an administrative law judge

is not obligated to accept the testimony of a claimant if it is

not supported by the medical evidence. An impairment, whether

physical or mental, must be established by "medical evidence

consisting of signs, symptoms, and laboratory findings," and not

just by the claimant's subjective statements. 20 C.F.R. §

404.1508 (2007).

The administrative law judge appropriately considered

the contrary medical opinions of Dr. Gryczko, Dr. Kolb, Dr. Hess

27

and Dr. Riedhammer and the objective medical evidence and concluded that the conclusory opinion of Dr. Thomas was not adequately supported by objective medical evidence consisting of signs, symptoms and laboratory findings. The administrative law judge in rejecting the opinion of Dr. Thomas found that it was conclusory and that Dr. Thomas's treatment notes did not support Updegraff's claim that he was totally disabled. The administrative law judge gave an adequate explanation for rejecting the opinion of Dr. Thomas. Also, the administrative law judge appropriately considered the treatment records of Dr. Galloway in concluding that Updegraff was not totally disabled but could engage in a limited range of unskilled, light work. The administrative law judge pointed out that the functional capacity evaluation ordered by Dr. Galloway indicated that Updegraff could engage in light to medium work. Tr. 216. As for nurse Peterman's assessment, the administrative law judge noted that Updegraff's physical examinations by nurse Peterman had "been relatively benign, with virtually no objective findings that would substantiate [Updegraff's] subjective complaints." Tr. 217.

The administrative law judge relied on the opinion of Dr. Gryczko, the state agency physician. The administrative law judge's reliance on that opinion was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was

properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

The administrative law judge stated that Updegraff's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the ability to perform a limited range of unskilled, light work. There is no basis to question that credibility judgment. The administrative law judge was not required to accept Updegraff's claims regarding his physical and mental limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make). It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed and heard Updegraff testify, the administrative law judge is the one best suited to assess the credibility of Updegraff.

The Court's review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner will be affirmed.

An appropriate order will be entered.

_____
**United States District Judge**

Dated: June 21, 2013